NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
MARK TAKLA (Cal. Bar No. 218111)
ANNAMARTINE SALICK (Cal. Bar No. 309254)
Assistant United States Attorneys
Terrorism and Export Crimes Section
     United States Attorney's Office
     411 West Fourth Street, Suite 8000
     Santa Ana, California 92701
     Telephone:  (714) 338-3500
     Facsimile:  (714) 338-3561
     Email:      mark.takla@usdoj.gov
                 annamartine.salick2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>                v.<br><br>STEPHEN WILLIAM BEAL,<br><br>          Defendant. | No. SA CR 19-047-JLS<br>          CR 20-060-JLS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR RECONSIDERATION OF BOND; DECLARATIONS OF MARK TAKLA AND JAIME MANRIQUEZ; EXHIBITS<br><br>Hearing Date: September 2, 2020<br>Hearing Time: 10:00 a.m.<br>Location:     Courtroom of the<br>              Hon. John D. Early |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and undersigned counsel, hereby files this Opposition to Defendant's Application for Reconsideration of Bond.  This Response is based on the attached Memorandum of Points and Authorities, the

///

///

files and records in this case, and any additional evidence and argument that the Court receives at the hearing on this matter.

Dated: August 31, 2020                    Respectfully submitted,

NICOLA T. HANNA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

*Mark Takla*

_____
MARK TAKLA
ANNAMARTINE SALICK
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION..................................................1

II.  LEGAL STANDARD...............................................1

III. DEFENDANT HAS FAILED TO REBUT THE PRESUMPTION THAT HE IS A
     DANGER TO THE COMMUNITY AND A FLIGHT RISK....................4

     A.   Defendant's New Evidence Was Available to Him During
          Both His Prior Hearings................................6

     B.   Defendant's Actions after the Bombing Do Not Rebut the
          Presumption, Nor Demonstrate He Is Not Likely to Flee.....7

     C.   Defendant's Sureties Are Insufficient to Rebut the
          Presumption...........................................9

IV.  EVEN IF DEFENDANT HAS REBUTTED THE PRESUMPTION, PRETRIAL
     DETENTION IS STILL NECESSARY...............................10

     A.   Nature and Circumstances of the Offenses..............10

     B.   Weight of the Evidence................................11

     C.   History and Characteristics of the Defendant..........12

          1.   Defendant Possessed a Large Amount of Explosive
               Precursor Chemicals in His Residence for Years.....12

          2.   Defendant Is Charged in a Separate Case with
               Bankruptcy Fraud................................12

          3.   Defendant Has Committed Additional Federal Crimes
               While in Custody................................13

               a.   Disability Fraud While in Custody..........13

               b.   Defendant Has Committed Bankruptcy Fraud
                    While in Custody...........................15

          4.   Defendant's Claim of Volunteer Work Is
               Contradicted by His Disability Claimant
               Questionnaire...................................16

          5.   Hatred toward the Investigating Agents..........16

     D.   Nature and Seriousness of the Danger to Any Person or
          the Community that Would Be Posed by the Defendant's
          Release...............................................17

V.    COVID-19 DOES NOT CHANGE THE CALCULUS..........................17

      A.    Defendant's Medical History..............................17

      B.    The Santa Ana Jail Precautions...........................17

VI.   THE SANTA ANA JAIL COVID-19 RESTRICTIONS DO NOT INTERFERE
      WITH DEFENDANT'S CONSTITUTIONAL RIGHTS.........................18

VII.  CONCLUSION.....................................................18

**TABLE OF AUTHORITIES**

**CASES**                                                                    **Page(s)**

Casey v. Lewis,
  4 F.3d 1516 (9th Cir. 1993) ...................................... 18

United States v. Bourgeois,
  423 F.3d 501 (5th Cir. 2005) .................................... 7

United States v. Dillon,
  938 F.2d 1412 (1st Cir. 1991) (per curiam) ..................... 3

United States v. Dominguez,
  783 F.2d 702 (7th Cir. 1986) .................................... 3

United States v. Hare,
  873 F.2d 796 (5th Cir. 1989) ................................. 3, 4

United States v. Hir,
  517 F.3d 1081 (9th Cir. 2008) ................................... 3

United States v. King,
  849 F.2d 485 (11th Cir. 1988) ................................... 2

United States v. Motamedi,
  767 F.2d 1403 (9th Cir. 1985) ................................... 1

United States v. Perez-Franco,
  839 F.2d 867 (1st Cir. 1988) .................................... 3

United States v. Reynolds,
  956 F.2d 192 (9th Cir. 1992) ................................... 13

United States v. Trosper,
  809 F.2d 1107 (5th Cir. 1987) ................................... 2

United States v. Ward,
  63 F. Supp. 2d 1203 (C.D. Cal. 1999) ........................... 3

United States v. Winsor,
  785 F.2d 755 (9th Cir. 1986) ................................. 2, 3

**TABLE OF AUTHORITIES**

**STATUTES**                                                    **Page(s)**

18 U.S.C. § 152 ................................................. 12

18 U.S.C. § 844 ............................................ 4, 6, 8

18 U.S.C. § 924 ............................................... 2, 4

18 U.S.C. § 2332 .............................................. 2, 6

18 U.S.C. § 2332a ................................................ 4

18 U.S.C. § 3142 ............................................ passim

18 U.S.C. § 3148 ................................................ 13

18 U.S.C. § 3592 ................................................. 7

26 U.S.C. § 5861 ..................................... 7, 8, 11, 12

MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant STEPHEN WILLIAM BEAL ("defendant") has been in custody for approximately 17 months pending an October 5, 2021 trial date on charges that he intentionally used a Weapon on Mass Destruction ("WMD") to kill his ex-girlfriend, seriously wounding two other victims and obliterating a commercial office space in the process. Defendant now moves to be released on bond, a request the government strongly opposes. For the reasons described more fully below, defendant continues to present a clear danger to the community and a flight risk, and has failed to articulate a change in circumstance that warrants review of his detention or rebuts the statutory presumption against bail.

**II.   LEGAL STANDARD**

The Bail Reform Act of 1984 (the "Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. Motamedi, 767 F.2d at 1406.

In certain cases, the Act established a rebuttable presumption that a defendant is both a flight risk and a danger to the community.

18 U.S.C. § 3142(e).  This presumption exists if there is "probable cause" that the defendant committed a violation of (1) 18 U.S.C. § 924(c), or (2) an offense listed in 18 U.S.C. § 2332(b)(5)(B) for which the maximum punishment is ten or more years.  18 U.S.C. § 3142(e)(3)(B), (C).  A grand jury's return of an indictment for these offenses establishes probable cause and triggers the statutory presumption.  See, e.g., United States v. Trosper, 809 F.2d 1107, 1110 (5th Cir. 1987) ("[T]he presumption against pretrial release arises when drug crimes are charged in the indictment.").  Once the presumption is triggered, the defendant has the burden of producing some credible evidence to rebut the presumption.  United States v. Hare, 873 F.2d 796, 798 (5th Cir. 1989); United States v. King, 849 F.2d 485, 488 (11th Cir. 1988).  In this case, the grand jury returned an indictment on not one, but two offenses, triggering the rebuttable presumption.

If the defendant proffers credible evidence to rebut the presumption, there are several statutory factors to consider in determining whether pretrial detention is appropriate: (1) the nature and circumstances of the offenses; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).  Moreover, Congress intended that the statutory presumption would have a practical effect.  "The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to

2

factors listed in § 3142(g).'" United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986)); United States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988). Of the factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt. Winsor, 785 F.2d at 757.

Once a detention determination has been made, a motion for bail review can only be made "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing," and that information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the initial hearing. See United States v. Ward, 63 F. Supp. 2d 1203, 1207 (C.D. Cal. 1999); United States v. Dillon, 938 F.2d 1412, 1415 (1st Cir. 1991) (per curiam) (affirming district court's refusal to reopen hearing where defendant's evidence consisted of affidavits and letters from people who knew him attesting to his likelihood of appearing and non-dangerousness; "this information was available to appellant at the time of the [original] hearing"); United States v. Hare, 873 F.2d 796, 799 (5th Cir. 1989) (affirming refusal to reopen hearing because "testimony of Hare's family and friends is not new evidence").

## III. DEFENDANT HAS FAILED TO REBUT THE PRESUMPTION THAT HE IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK

On Tuesday, May 15, 2018 at approximately 1:08 p.m., an explosion ripped through a commercial office building located at 11 Mareblu in Aliso Viejo, California. (Complaint ¶ 5, SA CR 19-00046-JLS; Ex. A.) The explosion instantly killed Ildiko Krajnyak ("Krajnyak"), the owner of a day spa called Magyar Kosmetica, and seriously injured two of her clients. Krajnyak was blown apart with pieces of her body strewn throughout the day spa, parking lot, and even in the nearby trees and bushes. The two clients were severely burned, required multiple surgeries, and have permanent and life-altering physical and psychological injuries.[1]

On March 13, 2019, a Grand Jury indicted defendant in connection with the intentional murder of Krajnyak with violations of the following: 18 U.S.C. § 2332a(a)(2) (Use of a Weapon of Mass Destruction Resulting in Death); 18 U.S.C. § 844(i) (Malicious Destruction of a Building Resulting in Death); and 18 U.S.C. § 924(c) (Use of a Destructive Device During and in Relation to a Crime of Violence). (Indictment, SA CR 19-00046-JLS.)

The Court held a detention hearing in the bombing case, SA CR 19-00046-JLS, on March 4, 2019. At the hearing, the government proffered the complaint and pretrial services report with its recommendation of detention. Defendant did not oppose the proffer, and did not seek release. The Court found that the government had proven by clear and convincing evidence that no condition or

---

[1] As the facts are well-known to the Court and are also contained in the Affidavit supporting the Complaint, they are not all restated here.

4

combination of conductions of release would reasonably assure the safety of any other person and the community, and by a preponderance of the evidence that no condition or combination of conditions of release would reasonable assure defendant's appearance as required. (Docket #10, SA CR 19-00046-JLS; Ex. Y.)  The Court further noted that the weight of the evidence against defendant was strong, that he was subject to a lengthy guideline sentence if convicted, that he had a prior untreated mental health diagnosis, and significant overseas travel.  (Id.)  Finally, the Court noted "Because of the every day nature of many of the alleged components of the alleged explosive device, and defendant's knowledge of pyrotechnics and previous possession of many if not all of those components, a serious danger would be posed to the community." (Id.)

On February 24, 2020, the Honorable Autumn D. Spaeth, United States Magistrate Judge, held a detention hearing in the bankruptcy case, SA CR 20-00060-JLS.  At the hearing, the government proffered the indictment and pretrial services report with its recommendation of detention.  Defendant did not oppose the proffer, and did not seek release.  Again, the Court found that the government had proven by clear and convincing evidence that no condition or combination of conductions of release would reasonably assure the safety of any other person and the community, and by a preponderance of the evidence that no condition or combination of conditions of release would reasonable assure defendant's appearance as required.  (Docket #9, SA CR 20-00060-JLS; Ex. Y.)  The Court further noted that defendant had prior criminal history, a history of violence or use of weapons, and a lack of financially responsible sureties.  (Id.)  The Court further noted that defendant was in custody on "other, very

serious charges with allegations of the use of explosives resulting in death" and that because of the "serious nature of those charges, a serious risk of flight and danger to the community exist."  (Id.)

Both 18 U.S.C. §§ 844(i) and 2332a are offenses that carry a statutory presumption of detention.  Both are listed in 18 U.S.C. § 2332(b)(5)(b) and carry a maximum punishment of death.[2]  The government is therefore entitled to a rebuttable presumption that defendant is both a flight risk and a danger to the community.  18 U.S.C. § 3142(e).

Defendant fails to raise any new credible evidence that warrants revisiting his detention order and, even if the information were new, none of the facts proffered by defendant rebut the presumption either with respect to flight or danger.

### A.   Defendant's New Evidence Was Available to Him During Both His Prior Hearings

Defendant claims the following new facts warrant a detention hearing: defendant's age and health due to the COVID-19 pandemic, the government's decision not to seek the death penalty, and additional sureties.  (Docket #57, SA CR 19-00046-JLS.)  The government believes these facts do not constitute evidence unavailable to defendant during his prior hearings.  First, as more thoroughly explained in the Government's Under Seal Supplement, defendant's medical history does not place him in a higher risk for COVID-19.  Further, the precautions taken by the Santa Ana Jail minimize defendant's risk due to age.  Second, the indictment never alleged the aggravating factors

---

[2] On June 22, 2020, the government filed its notice of intent not to seek the death penalty in this case, therefore the maximum punishment that can be imposed in this case is life imprisonment.

6

necessary for a capital punishment under 18 U.S.C. § 3592, therefore under this indictment, the death penalty could not be imposed.[3] United States v. Bourgeois, 423 F.3d 501, 507 (5th Cir. 2005). Finally, the sureties appeared available in both March 2019 and February 2020.  His residence is not new information.  Defendant lived there could have posted it when he was first arrested. Regarding his family and friends, he was certainly aware of them and their ability to sign affidavits in March 2019 and February 2020. Defendant's claimed changed circumstances do not warrant revisiting bail.

> **B.    Defendant's Actions after the Bombing Do Not Rebut the Presumption, Nor Demonstrate He Is Not Likely to Flee**

Even if defendant demonstrated a change in circumstance sufficient to warrant a review of his detention order, none of defendant's claims rebut the statutory presumption for detention.

First, defendant claims that his failure to flee after his release demonstrates he is not a danger or flight risk.  (Def.'s Request, at 4-5.)  He claims he was rearrested in March 2019 for the same crime as the first and that the government had no further inculpatory evidence than it did prior to the first arrest.  (Id.)

Defendant misstates these facts.  In May 2018, defendant was arrested on a complaint alleging a violation of 26 U.S.C. § 5861(d) (Possession of an Unregistered Destructive Device) after law enforcement found two cardboard tubes at his residence in Long Beach, California believed to be destructive devices.  (Ex. B.)  The

---

[3] Until June 2020, the Attorney General had not made a decision as to whether to seek the death penalty, but this case was never charged as one.

7

complaint was dismissed after law enforcement determined the tubes were not destructive devices. (Id.)  In March 2019, defendant was arrested on a complaint alleging a violation of 18 U.S.C. § 844(i) (Malicious Destruction of a Building Resulting in Death). (Complaint, SA CR 19-00046-JLS.)

These offenses are not the same.  They are wholly different, the latter being exponentially more serious than the former.[4]  Further, defendant's claim that there was no additional inculpatory evidence offered in the second complaint affidavit is also erroneous.  Among other items, the March 2019 affidavit identified: (1) a box and Company A brand battery used in the bombing that matched a box and battery defendant purchased the week prior to the bombing; (2) wire fragments found at the blast site that matched wire found at defendant's residence; (3) evidence that defendant was at the day spa four days prior to the bombing; (4) chemicals identified at the bombing site that matched chemicals found at defendant's house and in his new vehicle; and (5) witnesses reported that Krajnyak was afraid that defendant would harm Krajnyak.  (Complaint ¶¶ 26-27, SA CR 19-00046-JLS.)  Defendant's claim that he was re-arrested on the same charge without additional inculpatory evidence is plainly not true.

Defendant next claims even though he knew he was the subject of the government's investigation, he did not flee after his was released from custody.  His claim is inconsistent with statements he made to his girlfriend after the first arrest.  In October 2018,

---

[4] Defendant was ultimately indicted on four counts including 26 U.S.C. § 5861(d) (Possession of an Unregistered Destructive Device) related to the destructive device used to bomb 11 Mareblu in Aliso Viejo.  (Indictment.)  This count does not allege a violation relating to the possession of cardboard tubes at defendant's residence in Long Beach.

while defendant was out of custody, defendant told his girlfriend that he was in the "clear" and did not think he would be arrested for the bombing.  (Ex. C.)

Next, defendant argues that his voluntary interviews with the FBI demonstrate that he is not a flight risk.  The government disagrees.  Defendant's interviews with the FBI were part of defendant's calculated effort to obfuscate his involvement by appearing to be cooperative.  Defendant knew that, as the victim's ex-boyfriend and current business partner, law enforcement would look at him as a possible suspect.  Under the circumstances, his failure to cooperate would be seen as highly suspicious.  But defendant did not cooperate.  In fact, he made a series of false denials to the FBI.

Finally, the government notes that defendant has had significant international travel in the past three years to or through various locations such as Puerto Vallarta, Munich, Montreal, Vancouver, Havana, and Tokyo.  (Ex. V.)  These facts supports the conclusion that defendant is a flight risk.

Not only are these facts insufficient to warrant a change in circumstances that would trigger a review of detention, but none of defendant's claims alter the fact that defendant remains a clear threat to the community and a flight risk -- a presumption to which the government is statutorily entitled.

**C.  Defendant's Sureties Are Insufficient to Rebut the Presumption**

The government's position is that no bond can adequately ensure defendant's participation at trial.  However, defendant's sureties are wholly inadequate.  Most of his proposed security involves his

9

own residence.  The loss of a residence is a small consequence to the ability to abscond from a possible life sentence.  Further, his family and friends are likely to feel the same with such a small amount pledged; that a loss of $20,000 each is worth defendant avoiding a life sentence.  Defendant's sureties do not rebut the presumption of flight, and do not even address the presumption of danger.

**IV.   EVEN IF DEFENDANT HAS REBUTTED THE PRESUMPTION, PRETRIAL DETENTION IS STILL NECESSARY**

**A.   Nature and Circumstances of the Offenses**

The nature and circumstances of the offense unequivocally weigh in favor of detention.  In society, intentional murder is one of the most serious offenses in the criminal justice system.  The fact that the maximum punishment for this offense is death supports the conclusion that Congress equally viewed this offense as one of the most serious offenses in the United States Code.

Further, the circumstances of this murder are uniquely heinous not only to the deceased victim, but to any bystanders in proximity to the victim at the time of the murder.  Defendant used a bomb to commit his crime resulting in the Krajnyak's body being blown into pieces.  Further, two additional victims near Krajnyak also suffered severe burns requiring significant medical attention.

Finally, defendant set his bomb in a commercial office building, and it subsequently went off on a business day shortly after the lunch hour.  Defendant exhibited a callous disregard for the safety of Krajnyak's clients, all other individuals in the office building at the time, and those in the immediate proximity.  Had defendant's chemistry been off, he could have leveled the entire building and

nearby buildings, to include a preschool across the street.  (Ex. D.) As someone who had been to the day spa many times, defendant was certainly aware of the many businesses in the vicinity including the preschool.

This is not a typical murder.  This murder was particularly shocking and gruesome, and could easily have resulted in the death of far greater than one person.  Defendant's reckless disregard for the safety of others is of a level rarely seen in this district.

**B.   Weight of the Evidence**

While the least important of the factors, defendant had not only means, motive, and opportunity to commit these offenses, but also purchased items in the week prior to the explosion consistent with those used in the bomb.  (Complaint, SA CR 19-00046-JLS.)  In addition to the facts identified above and many others listed in the complaint, defendant stated that he was hurt and betrayed when Krajnyak told him she was in an intimate relationship with another man.  (Id.)  Finally, defendant's background in making rockets and pyrotechnics provided him with the expertise to create the bomb that destroyed Magyar Kosmetica, killed Krajnyak, and severely wounded two others.

The evidence of defendant's guilt is very strong.  In fact, every piece of forensic evidence collected in this case points to the defendant as the bomber.  Certainly, defendant can speculate as to others' motives for wanting to kill the victim, however the forensic evidence does not point to them.  As this Court noted in its Order of Detention Pending Trial, "[t]he weight of the evidence is strong, albeit circumstantial."  (Docket #10, SA CR 19-00046-JLS, at 3.)

11

**C.    History and Characteristics of the Defendant**

Defendant claims that he is an "asset" to the community. (Def.'s Request, at 8.)  The government disagrees.

                 1.    <u>Defendant Possessed a Large Amount of Explosive Precursor Chemicals in His Residence for Years</u>

In the days following the bombing, law enforcement searched defendant's residence.  (Complaint ¶ 9, SA CR 19-00046-JLS.)  During the search, law enforcement found the following: (1) approximately 130 pounds of explosive precursors, including potassium perchlorate, potassium chlorate, ammonium perchlorate, aluminum powder and flake, and sulfur powder; (2) containers of black powder and numerous other unknown energetic powders (which were determined to be energetic based on field testing); and (3) electric matches and wires.  (<u>Id.</u> ¶ 10.)  While defendant may claim these items were used in his hobbies of making model rockets and fireworks, the shear amount of precursor chemicals also demonstrates a callous disregard for the families who lived in his neighborhood.  Further, defendant stated that his interest in these hobbies had waned years ago, yet still chose to maintain these dangerous chemicals in his garage in a residential neighborhood.  (<u>Id.</u> ¶ 11.)

                 2.    <u>Defendant Is Charged in a Separate Case with Bankruptcy Fraud</u>

Defendant is currently charged in a second case, <u>United States v. Stephen William Beal</u>, CR 20-00060-JLS, for bankruptcy fraud in violation of 18 U.S.C. § 152(1) (Concealment of Bankruptcy Assets) and 18 U.S.C. § 152(7) (Fraudulent Transfer and Concealment).  (Ex. E.)  As the indictment alleges, defendant received a settlement of $350,000 from an accidental death policy after the death of his wife while in bankruptcy proceedings, yet knowingly and intentionally

failed to disclose the settlement to the bankruptcy court, the bankruptcy trustee, or his creditors.[5] (Id.)  Further, defendant immediately transferred that money to brokerage accounts and gave preferential treatment to creditor ABC Swimming Pools so that the company would maintain his swimming pool.  (Id.)  The bankruptcy court ultimately discharged defendant's debt of approximately $100,000.  (Ex. I.)  Defendant's bankruptcy fraud not only shows defendant's inability to follow rules in society demonstrating a flight risk, it also shows his danger to the community.  United States v. Reynolds, 956 F.2d 192, 192-93 (9th Cir. 1992) (stating danger includes pecuniary and economic harm).

        3.    Defendant Has Committed Additional Federal Crimes While in Custody

     Defendant has committed additional offenses while detained.  Had defendant been on bond, the government could request revocation of the bond on the ground that he had committed violations of federal law.  18 U.S.C. § 3148(b).  Defendant's violations of federal law while charged with a federal offense demonstrate defendant's inability to conform his conduct to the Court's conditions.

        a.    Disability Fraud While in Custody

     Defendant has been on disability since 2008.  His former employer, Marsh & McLennan ("M&M"), issued the disability policy

---

[5] Defendant elected to receive coverage under the accidental death policy for his wife on January 1, 2008 a mere two months prior to her death in March 2008.  (Ex. F.)  Defendant's wife's physician thought the death was unusual and noted that defendant continued to interrupt his wife when her physician asked her questions during the visit.  (Ex. G.)  The physician also noted that defendant's wife should not have died and that the autopsy found unusual levels of lead and arsenic in her system.  (Id.)  Defendant apparently did know she was going to die, as he told one witness that he said his goodbyes to her before going home the night of her death.  (Ex. H.)

13

which is administered by The Hartford.  From 2008 to the present, M&M paid almost $1,000,000 in disability payments to defendant.  (Exs. J, K.)  In order to maintain the disability payments, defendant must submit disability Claimant Questionnaires at regular intervals to The Hartford.  (Under Seal Ex. AA.)  Over the years, defendant has complained of ████████████████████████████████████████████████ ████████████████████████████████████████ [6] (Id.)  He must also submit Attending Physician's Statements signed by his doctors. (Under Seal Ex. BB.)  In the Claimant Questionnaires, defendant stated, that among other activities, his disability prevented him from engaging in model rocketry, acting as the "skipper" of a sailboat,[7] enjoying movies, volunteering, and church attendance (at times).  (Under Seal Ex. AA.)

Despite these alleged disabilities, defendant has enjoyed his model rocketry hobby (Exs. H, L), regularly rented sailboats and acted as the skipper (Exs. H, M), regularly reads (Exs. W, X, Jail Calls #1, 4), and acted in several movies and at least one play (Exs. N, O, U, W, X).  Two witnesses observed that defendant never had trouble remembering his lines.  (Exs. H, O.)  Finally, defendant scored 100% on a 50-question closed-book SCUBA certification in August 4, 2018 and obtained high scores in various sailing certifications.  (Exs. M, P.)  There is probable cause to believe defendant committed disability fraud.[8]  While in custody, he

---

[6] See the Government's Under Seal Supplement to its Opposition to Defendant's Application for Reconsideration of Bond.

[7] In naval parlance, the skipper or captain of a vessel is the individual in charge of the vessel.

[8] The Hartford mailed checks and directly deposited the remaining payments into defendant's bank account, so this fraud constitutes mail and wire fraud.  (Exs. J, K.)

14

submitted the June 19, 2019 disability Claimant Questionnaire claiming that he could not work because of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ (Under Seal Ex. AA.)  He did so a mere year after scoring 100% on his SCUBA certification and five months after acting in the play, 12 Angry Jurors.  (Exs. O, P, U, X, Video #2.)  There is probable cause to believe that he committed mail and wire fraud while detained for the instant crimes.

> b.    *Defendant Has Committed Bankruptcy Fraud While in Custody*

Defendant has conspired to and committed bankruptcy fraud while in custody.  On October 20, 2018 prior to his second arrest, defendant filed a second petition for bankruptcy.  (Ex. Q.).  In doing so, defendant filed a schedule J identifying his income and expenses.  (Id.)  To the extent the income exceeded his expenses, he was required to pay his remaining disposable income of $476 to the bankruptcy trustee for disbursement to his creditors.  (Id.)  After filing the schedule J and the bankruptcy plan confirmed, defendant was placed in custody in March 2019 and obtained renters for his residence in August 2019.[9]  (Ex. S.)  Instead of paying his additional disposable income to his creditors, defendant concealed it, giving it to his current girlfriend.  (Exs. R, S.)  From April 2019 through April 2020, she has transferred and withdrawn approximately $41,000 from defendant's accounts.  (Exs. R, S.)  With defendant's knowledge and encouragement, she has used the money to pay her rent, pay down $40,000 in her debt, and purchase a 2017

---

[9] Ernst and Haas the management company for the lease.  (Ex. S.) Defendant's renters pay him approximately $4,100 in rent per month. (Id.)

15

Mercedes Benz. (Exs. W, X, Jail Calls #6-10.)  Most recently, again with defendant's knowledge and consent, she established a direct deposit from defendant's bank account to pay her rent and storage fees.  (Exs. W, X, Jail Call #11.)  Importantly, defendant committed this bankruptcy fraud after being charged with bankruptcy fraud related to his 2008 bankruptcy in February 2020.

4.    Defendant's Claim of Volunteer Work Is Contradicted by His Disability Claimant Questionnaire

Defendant promoted his volunteer work as evidence that he is not a danger and flight risk. (Def.'s Request, at 7.)  However, defendant contradicted that statement in his disability Claimant Questionnaire.  In June 2019, he submitted a Claimant Questionnaire to The Hartford stating that volunteerism was an activity he was able to do prior to his disability, but not after.  (Under Seal Ex. AA, at 1.)

5.   Hatred toward the Investigating Agents

Finally, defendant has expressed a tremendous amount of hatred toward the investigating agents in this case.  While some animosity is to be expected, defendant stated:

> I humbly entreat that the damage they [the FBI] have done is heaped back onto them 100 fold.  I yearn for their humiliation.  I ache for their destruction.  Allow them Lord to lose their jobs and their families.  Allow sickness to overtake their lives.  Allow them to be able to see devastation and ridicule, and push them to repent for their evil.  Oh God, please grant me the opportunity to see them in agony.  Their laughter turning to tears, and their pride to downfall.

(Exs. W, X, Jail Call #5.)  These are not the words of an asset to the community.

16

**D.    Nature and Seriousness of the Danger to Any Person or the Community that Would Be Posed by the Defendant's Release**

This was no normal murder.  Every member of society is in danger with defendant on bond.  Defendant detonated the bomb with total disregard of the safety of those in and around the building. Defendant's neighbors were in danger with the way defendant stored his precursor chemicals.  Defendant's girlfriend and her minor daughter would be in danger if he is released.  Finally, defendant has a particular hatred for the investigating agents in his case. Defendant's repeated commission of fraud while in custody shows that he does not care to conform his actions to those expected in society. The danger is serious.  The harm is real.  Defendant cannot be released.

**V.    COVID-19 DOES NOT CHANGE THE CALCULUS**

**A.    Defendant's Medical History**

See the Government's Under Seal Supplement to its Opposition to Defendant's Application for Reconsideration of Bond; Exhibits.

**B.    The Santa Ana Jail Precautions**

Defendant cites to COVID-19 breakouts in other jails, noting that searches, cuffing, and transport can increase the risk of exposure.  The Santa Ana Jail has done an extraordinary job in protecting inmates in the jail from COVID-19.  Specifically, the Santa Ana Jail has suspended public visits and limited professional ones to non-contact visits.  (Declaration of Jaime Manriquez.)  Staff and inmates have regular temperature checks.  (Id.)  Defendant is housed in a special unit with inmates over 60 year of age.  (Id.) The Santa Ana Jail limits staff interaction with inmates in this special unit.  (Id.)  The careful measures used by the Santa Ana Jail

17

has been successful in preventing the widespread breakout of COVID-19 that has been seen in other jails identified by defendant in his filing.

**VI.   THE SANTA ANA JAIL COVID-19 RESTRICTIONS DO NOT INTERFERE WITH DEFENDANT'S CONSTITUTIONAL RIGHTS**

Defendant claims that the Santa Ana Jail's COVID-19 no-contact visit policy interferes with his constitutional right to counsel. Defendant's argument is inconstant with Ninth Circuit precedence.  In Casey v. Lewis, the Ninth Circuit stated that the Arizona Department of Corrections ("AOC") policy forbidding attorney contact visits was constitutional as it was rationally related to the legitimate penological interests of prevention of escape, assault, hostage-taking, and the introduction of contraband.  4 F.3d 1516, 1523 (9th Cir. 1993).  Certainly, for the reasons stated in pages 11-17 of defendant's request, the no-contact visit policy in the post-COVID-19 world is rationally related to the legitimate penological interest of preventing infection in the Santa Ana Jail.

With respect to defendant's second concern that calls with his attorneys are being monitored by the FBI, they are not.  Government counsel take their ethical obligations very seriously.  They will not themselves, nor permit the FBI investigating agents to, listen to any call protected by the attorney-client privilege.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's request for release.